UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JUSTIN D. COHEN,

    **Plaintiff,**

                                                                                         Civil Action 2:15-cv-431
    v.                                                         Judge James L. Graham
                                                                 Magistrate Judge Elizabeth P. Deavers

GARY C. MOHR, *et al.*,

    **Defendants.**

### ORDER AND REPORT AND RECOMMENDATION

This matter is before the Court for consideration of Defendants' Motions for Summary Judgment (ECF Nos. 52 & 69), Plaintiff's Response in Opposition (ECF No. 91), and Defendants' Reply (ECF No. 102). For the reasons that follow, it is **RECOMMENDED** that Defendants' Motion for Summary Judgment be **GRANTED** and that judgment be entered in favor of Defendants.

### I. BACKGROUND

Plaintiff, a former prison inmate under the custody and control of the Ohio Department of Rehabilitation and Correction (the "ODRC"), was incarcerated at the Belmont Correctional Institution ("BCI") at the time of the filing of his Verified Complaint. Plaintiff brought his claims pursuant to 42 U.S.C. § 1983 alleging violations of the Eighth Amendment against Defendants Gary C. Mohr, the Director of the Ohio Department of Rehabilitation and Corrections ("ODRC"); Dr. Andrew Eddy, the State Medical Director for ODRC; Mick Oppy, the former warden of the Correctional Reception Center (the "CRC"); Lisa Entler, the former Healthcare Administrator for the CRC; Michele Miller, the Warden at BCI; Brad Eller, the

former Healthcare Administrator at BCI; Drs. Aaron Samuels and Paul Weidman, physicians employed by ODRC who treat inmates at BCI; and, Michelle McNally, a nurse at BCI. (ECF No. 8.)

According to Plaintiff's Verified Complaint, he first received medical care from Defendants for his preexisting Crohn's disease on March 15, 2014, the day he arrived at CRC from Montgomery County, Ohio. (ECF No. 8 at 5.) Plaintiff states that he requested treatment with Entocort, but instead received Azacort on March 17, 2014. (*Id*. at 6.) Plaintiff also states that on March 18, 2014 he began receiving treatment with Mesalamine and passed a kidney stone. (*Id*.) According to Plaintiff, he signed a second set of medical release forms on March 20, 2014 in order for prison officials to receive his prior medical records detailing his treatment history for Crohn's Disease and kidney stones. (*Id*.) Plaintiff states that on March 21, 2014 he unilaterally lowered his daily dosage of Mesalamine due to stomach pain and incontinence. (*Id*.) Plaintiff claims that for the next six days he suffered "severe cramps and frequent bowel movements from the Crohn's Disease," as well as kidney pain. (*Id*.)

Plaintiff further states that on March 28, 2014 he met with an unnamed doctor who told him that his x-rays were negative for additional kidney stones. (*Id*. at 7.) According to Plaintiff, he again signed medical releases for his prior medical records. (*Id*.) Plaintiff claims that for the next two days he "was still in extreme pain, having frequent stomach upset and cramps, and frequent bowel movements." (*Id*.) On March 31, 2014 Plaintiff again saw the doctor, who informed Plaintiff that he would not be treated with Entocort and that he should purchase over the counter pain relievers to help manage his pain. (*Id*.) According to Plaintiff, he signed a fourth set of medical release forms for his prior medical records. (*Id*.)

2

Plaintiff claims that from April 1-7, 2014 he suffered "constant nausea, constant pain and irritable bowels, depression, fatigue and exhaustion from loss of significant sleep" and filed a complaint with the warden. (*Id*.) According to Plaintiff on April 9, 2014 doctors began treatment with Prednizone and Diazecol in place of Mezalamine. (*Id*. at 8.) Plaintiff states that on April 16, 2014 he saw another doctor, who prescribed a potassium supplement. (*Id*.) Plaintiff further states that on April 17, 2014 he began receiving Hytrin and was told by an unnamed nurse that his medical release forms were faxed to the wrong number. (*Id*.)

According to Plaintiff, on April 18, 2014 he met with a mental health official for depression prior to his transfer to BCI. (*Id*. at 9.) Plaintiff alleges that on April 21, 2014, an attorney sent a letter to CRC that included documents from his previous healthcare providers, including a recommendation that Plaintiff receive "Entocort 9 mg by mouth daily." (*Id*. at 9, 27.) Plaintiff states that he continued to suffer abdominal pain and incontinence and on April 23, 2014 saw a dietary technician, who ordered an adjustment in his diet to six small meals daily. (*Id*.)

Plaintiff states that he met with Defendant Oppy on April 25, 2014 and explained his various complaints. (*Id*. at 10.) Plaintiff also states that on April 26, 2014 he saw a nurse and again requested Entocort. (*Id*.) On April 28, 2014 Plaintiff again saw the nurse and filed an informal complaint claiming inadequate medical treatment. (*Id*.) Plaintiff states that he saw the doctor on May 1, 2014 and learned that CRC still had not received his medical records. (*Id*.)

Plaintiff claims that on an unstated date he met with Defendant Entler regarding his complaint. According to Plaintiff, Defendant Entler told him that she would speak to the doctor and that Vitamin D supplements and pain relievers were available in the CRC commissary. (*Id*. at 12.)

Plaintiff further states in his Complaint that CRC staff did bloodwork and other lab work on May 8, 2014. (*Id*.) According to Plaintiff he was "still feeling ill with no relief, nausea and upset stomach throughout day and night . . . losing weight and still unable to eat, have a normal bowel movement or sleep for any length of time." (*Id*.) Plaintiff states that on May 9, 2014 he learned that at least some of his medical records had reached BCI medical staff. (*Id*.) Plaintiff claims that from May 10-20, 2014 Hytrin was unavailable and he filed a grievance on May 14, 2014. (*Id*.) According to his Complaint, Plaintiff had more bloodwork done the next day. (*Id*.)

Plaintiff states that when he was transferred to BCI on May 21, 2014 he "was still experiencing discomfort and abdominal pain." (*Id*.) According to Plaintiff, he saw health services at BCI on May 23, 2014 and explained his medical history and his complaints about the care he received at CRC. (*Id*. at 13.) Plaintiff states that he saw a mental health official on May 27, 2014 and again reiterated his complaints and stated that his treatment was causing "additional anxiety and depression." (*Id*.)

Plaintiff states that on June 4, 2014 he saw a nurse for a sinus infection that he attributes to "his allergies and weakened immune system." (*Id*. at 13-14.) According to Plaintiff, he received a prescription for Benedryl on June 6, 2014. (*Id*. at 14.) Plaintiff states that he saw the doctor on June 17, 2014 and received a prescription of antibiotics for his sinus infection, although he refused to take it after consulting his family physician. (*Id*.) Plaintiff claims that his Crohn's Disease had then gone untreated for almost 90 days. (*Id*.) On June 24, 2014 Plaintiff again saw a doctor. Plaintiff states that he signed an Against Medical Advice form regarding his refusal to take his antibiotic. (*Id*.) Plaintiff also states that the doctor informed him that "there are no kidney stone issues." (*Id*.)

4

Plaintiff further states that he received potassium, Hytrin, and Vitamin D on June 27, 2014. (*Id.*) According to Plaintiff, he continued to suffer abdominal pain and incontinence and saw Defendant Dr. Weidman on July 10, 2014. (*Id.*) According to Plaintiff, Defendant Dr. Weidman terminated the appointment when Plaintiff continued to refuse to take his antibiotics. (*Id*. at 14-15.) According to Plaintiff, he continued to suffer his previous symptoms and had more bloodwork done on August 20, 2014. (*Id*. at 15.) Plaintiff states that he had another doctor's appointment on August 30, 2014, x-rays taken on September 8, 2014, and additional bloodwork done on September 12, 2014. (*Id.*) Plaintiff claims that on September 17, 2014 Defendant Dr. Samuels informed him of the presence of additional kidney stones but said that "there was nothing the doctor was able to do for him." (*Id.*)

Plaintiff states that he received a response to his complaint from Defendant Eller that recommended he "continue to follow your plan of care" and "report any changes to Nurse Sick Call." (*Id*. at 16.) Plaintiff also states that the continued inclusion of peanut butter and whole grain bread in his meal plan exacerbated his symptoms. (*Id.*) Plaintiff claims that on November 4, 2014 he again saw Defendant Dr. Samuels, who "refused to offer any remedy or relief from the constant suffering." (*Id*. at 16.)

On February 2, 2015 Plaintiff filed his Complaint alleging Defendants' deliberate indifference in violation of his Eighth Amendment rights against cruel and unusual punishment. (*Id*. at 18.)

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party has the initial

5

burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stansberry v. Air Wisconsin Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion").

"Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial.'" *Kimble v. Wasylyshyn*, No. 10–3110, 2011 WL 4469612 at *3 (6th Cir. Sept. 28, 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, . . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (internal quotation marks and citations omitted). In considering the factual allegations and evidence presented in a motion for summary judgment, the Court must "afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

Further, the Court holds *pro se* filings "'to less stringent standards than formal pleadings drafted by lawyers.'" *Garrett v. Belmont Cnty. Sheriff's Dep't*, No. 08-3978, 2010 WL

6

1252923, at *2 (6th Cir. April 1, 2010) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). This lenient treatment, however, has limits; "'courts should not have to guess at the nature of the claim asserted.'" *Frengler v. Gen. Motors*, 482 F. App'x 975, 976-77 (6th Cir. 2012) (quoting *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)). In this context, the Court has thoroughly reviewed the pleadings and other documents presented by Plaintiff as it proceeds to rule on Defendants' Motion for Summary Judgment.

### III. ANALYSIS

### A. Defendants' Supervisory Liability under 42 U.S.C. § 1983

Plaintiff brings his claims against Defendants under 42 U.S.C. § 1983, which provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

In order to proceed under § 1983, a plaintiff must prove both that (1) the perpetrator acted under color of state law; and (2) the conduct deprived the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981); *Brandon v. Allen*, 719 F.2d 151, 153 (6th Cir.1983), *rev'd and remanded sub nom*, *Brandon v. Holt*, 469 U.S. 464 (1985). As a general rule, a plaintiff proceeding under § 1983 must allege that the deprivation of his rights was intentional or at least the result of gross negligence. *Davidson v. Cannon*, 474 U.S. 344, 348 (1986). Mere negligence is not actionable under § 1983. *Chesney v. Hill*, 813 F.2d 754, 755 (6th Cir. 1987).

7


Prison officials, whose only roles involve the denial of administrative grievances or the exercise of supervisory authority, are not liable under § 1983. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir.1999). To establish liability under § 1983, a plaintiff must plead and prove that a defendant is personally responsible for the unconstitutional actions which injured him. *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). *Respondeat superior* is not a basis for liability. *Polk Co. v. Dodson*, 454 U.S. 313, 325 (1981); *Rizzo v. Goode*, 423 U.S. 362, 371 (1976). Under 42 U.S.C. § 1983, a supervisor is not liable for "mere failure to act." *Shehee*, 199 F.3d at 300. Plaintiff's Verified Complaint contains no factual allegations that defendants Gary C. Mohr, Andrew Eddy, Michele Miller, Brad Eller, Michelle McNally, Micky Oppy, or Lisa Entler were directly involved in the alleged denial of medical care. Instead, Plaintiff faults them in their roles as supervisors only.

With respect to Defendant Mohr, Plaintiff stated in his deposition testimony that he sued him because "[h]e's the head of the ODRC, which means his job would have him oversee all medical care that his employee prescribes. So basically he's the big boss in charge of everything." (ECF No. 49 at 8.) Concerning Defendant Eddy, Plaintiff testified that he sued him because "I have filed grievances and he's overheard the grievances, I believe." (*Id.* at 9.) With respect to Defendant Miller, Plaintiff testified that she was not involved in any of his medical care. (*Id.*) Plaintiff stated that he sued her because "her job is to oversee the healthcare services at [BCI]." (*Id.*) Regarding Defendant Eller, Plaintiff testified that he sued him because he "was involved in the grievance process." (*Id.* at 10.) Concerning Defendant McNally, Plaintiff testified that he had no specific information to indicate she treated him. (*Id.* at 15.) Plaintiff testified that he sued her for her role of "being a nurse at this facility." (*Id.*) With respect to Defendant Oppy, Plaintiff does not allege in his Verified Complaint that he had any role in his

8

treatment.  (ECF No. 8 at 3.)  In his deposition testimony, Plaintiff stated that he "had meetings" with Defendant Oppy in which Plaintiff explained his objections to his medical care and that his attorney sent Defendant Oppy a letter documenting Plaintiff's medical conditions.  (ECF No. 49 at 9-10.)  With respect to Defendant Entler, Plaintiff testified that he sued her because "[she] was directly involved with my care in terms of as HCA she . . . coordinates and supervises nursing staff of the institution."  (*Id*. at 10.)

Concerning these Defendants, Plaintiff has provided no countervailing evidence regarding personal liability for the alleged denial of medical care.  The Undersigned finds, therefore, that with respect to Defendants Mohr, Eddy, Miller, Eller, McNally, Oppy, and Entler there is no genuine question of material fact regarding their personal liability for the alleged constitutional violations.

**B.  Claims Arising From Defendants' Alleged Denial of Medical Care**

Defendants contend that no genuine issue of material fact exists as to whether their medical care constitutes deliberate indifference in violation of the Eighth Amendment and maintain that their actions do not rise to the level of a constitutional violation.  The Undersigned agrees.

It is well established that "[t]he Eighth Amendment forbids prison officials from unnecessarily and wantonly inflicting pain on an inmate by acting with deliberate indifference toward [his] serious medical needs."  *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010) (internal quotations and citations omitted).  A claim for deliberate indifference "has both objective and subjective components."  *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011).  The United States Court of Appeals for the Sixth Circuit has explained:

9

> The objective component mandates a sufficiently serious medical need. [*Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir.2004).] The subjective component regards prison officials' state of mind. *Id.* Deliberate indifference "entails something more than mere negligence, but can be satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 895–96 (internal quotation marks and citations omitted). The prison official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 896 (internal quotation marks and citation omitted).

*Barnett v. Luttrell*, 414 F. App'x 784, 787–88 (6th Cir. 2011). The Sixth Circuit has also noted that in the context of deliberate indifference claims:

> [W]e distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment. Where a prisoner alleges only that the medical care he received was inadequate, federal courts are generally reluctant to second guess medical judgments. However, it is possible for medical treatment to be so woefully inadequate as to amount to no treatment at all.

*Alspaugh*, 643 F.3d at 169 (internal quotations and citations omitted). Similarly, "[o]rdinary medical malpractice does not satisfy the subjective component." *Grose v. Corr. Med. Servs., Inc.*, 400 F. App'x 986, 988 (6th Cir. 2010). Moreover, "a difference of opinion between [a prisoner] and the prison health care providers and a dispute over the adequacy of [a prisoner's] treatment . . . does not amount to an Eighth Amendment claim." *Apanovitch v. Wilkinson*, 32 F. App'x 704, 707 (6th Cir. 2002).

Here, Defendants contend that no genuine issue of material fact exists with respect to either of the two elements of a deliberate indifference claim. With respect to the objective component, Defendants deny that Plaintiff was suffering from a sufficiently serious medical need with respect to his Crohn's disease. Defendants point to the fact that Plaintiff himself "has not been compliant with the use of his current medications." (ECF No. 52 at 13.) With respect to Plaintiff's kidney stones, Defendants argue that, because Plaintiff's kidney stones are in his

kidney and not in his ureter, "[Plaintiff] presently has kidney stones that are not symptomatic." (*Id*. at 17.)  Consequently, they maintain that Plaintiff never was subjected to an objective risk of harm as required to establish the first element of a claim of deliberate indifference.  Likewise, with respect to the subjective component, Defendants deny that they ever withheld appropriate medical care from Plaintiff.  (*Id*. at 12.)  Rather, according to Defendants, "Plaintiff simply disagrees with the medication prescribed by the [BCI] physicians." *Id.* at 14.

In support of their position, Defendants point to Defendant Dr. Weidman's affidavit describing his treatment of Plaintiff's Crohn's Disease.  In his affidavit, Defendant Dr. Weidman declares as follows:

> Mr. Cohen suffers from Crohn's disease, which is a relapsing transmural inflammatory disease of the gastrointestinal tract.  I have been treating Mr. Cohen's condition with Mesalamine, a third-level anti-inflammatory drug.  On several occasions, Mr. Cohen has requested that I prescribe him Entocort rather than Mesalamine for his Crohn's disease.
> Entocort is a cortico-steroid that acts on gastrointenstinal areas.  It is more effective than prednisone but cortico-steroids are not appropriate for long-term maintenance of Crohn's disease except in very severe cases.  Side effects of Entocort include early cataract formation, hyperglycemia, adrenal failure, and avascular necrosis.  It is my professional medical opinion that the severity of Mr. Cohen's disease does not indicate a need for Entocort at this time. . . .
> When one of my Crohn's disease patients has a flare-up or a severe episode relative to the disease, I treat the patient with an injectable steroid and then follow-up with Prednisone, an oral steroid, and a pain management drug.

(ECF No. 52-1 at 2-3.)

Defendants also point to Defendant Dr. Weidman's declaration describing his treatment of Plaintiff's kidney stones.  Defendant Dr. Weidman declares in his affidavit as follows:

> [P]rior to his incarceration he underwent surgical procedures relative to the kidney stones and related calcification events.  Since his incarceration, there has been no indication for kidney stone surgery or other aggressive procedures.  Mr. Cohen presently has kidney stones that are not symptomatic.  He has stones in his kidney, not in his ureter.  Stones in a patient's kidneys do not generally

11

>become problematic until they drop into the ureter.  It is my medical opinion that Mr. Cohen is being properly treated for his kidney stones.

(*Id*. at 3.)  Defendant Dr. Weidman continues, "With respect to Mr. Cohen's Crohn's disease and kidney stones, he is regularly examined, monitored, and treated as a patient at the Institution's Chronic Care Clinic.  He is also regularly seen and treated by the medical services staff as a result of his requests for additional medical appointments."  (*Id.*)

Indeed, Plaintiff's own statements corroborate Defendant Dr. Weidman's declaration.  As summarized above, Plaintiff's Verified Complaint sets forth Plaintiff's frequent treatment visits to doctors as well as nurses at both CRC and BCI.  Plaintiff also lists at least four different occasions in a six-month period that Defendants did bloodwork to help in their evaluation and treatment.  (ECF No. 8 at 12, 15.)  Plaintiff also sets forth in his Verified Complaint numerous examples of Defendants' adjustments to his prescribed medications.  (*Id*. at 6, 8, 14.)  Plaintiff offers no evidence contradicting either this evidence or Defendants' argument regarding the subjective component of his Eighth Amendment Claim.

Even construing the facts in the light most favorable to Plaintiff, no reasonable jury could conclude that Defendants acted with deliberate indifference in treating his medical conditions.  Contrary to Plaintiff's claims that he was denied medical treatment, the evidence presented establishes that Defendants actively addressed Plaintiff's conditions and regularly adjusted his treatment plans.  The evidence is clear that the only person who failed to treat Plaintiff's conditions was Plaintiff himself, who failed to comply with Defendant Dr. Weidman's treatment plan.  (ECF No. 52-1 at 2.)  Plaintiff had numerous clinical visits, and Defendants took x-rays, did blood work on multiple occasions, and adjusted Plaintiff's medications in an effort to treat Plaintiff's Crohn's Disease and kidney stones.  At most, Plaintiff has demonstrated a

disagreement regarding his preferred treatment plan. As explained above, however, "a difference of opinion between [a prisoner] and the prison health care providers . . . does not amount to an Eighth Amendment claim." *Apanovitch*, 32 F. App'x at 707.

Similarly, Defendants are entitled to qualified immunity with respect to their treatment of Plaintiff. "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[Q]ualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal quotation marks and citations omitted). The determination of whether a government official is entitled to qualified immunity is a two-part inquiry. *Miller v. Sanilac County*, 606 F.3d 240, 247 (6th Cir. 2010). "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?" *Id.* (internal quotation marks and citations omitted). The Court need not consider these questions sequentially. *Jones v. Byrnes*, 585 F.3d 971, 975 (6th Cir. 2009) (citation omitted). "Once it is determined that the right is clearly established, the [C]ourt must determine 'whether the plaintiff has alleged sufficient facts supported by sufficient evidence to

13

indicate what [the defendant] allegedly did was objectively unreasonable in light of [the] clearly established constitutional rights.'" *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996) (quoting *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994)).

Here, Plaintiff has not adduced sufficient evidence to create a genuine issue of material fact as to whether Defendants acted objectively unreasonably in light of clearly established law. As set forth above, Defendants actively treated Plaintiff's conditions. There is no established constitution right to the prescription medication of one's choice. *Apanovitch*, 32 F. App'x at 707. The Undersigned finds, therefore, that Defendants are entitled to qualified immunity.

**C. Defendants' Failure to Timely Procure Plaintiff's Prior Medical Records**

In his Complaint, Plaintiff alleges that Defendants failed to procure his prior medical records for almost two months after his initial processing at CRC on March 15, 2014. (ECF No. 8 at 12.) According to Plaintiff, Defendants' failure to timely procure his records caused him additional and unnecessary suffering in violation of his Eighth Amendment rights against cruel and unusual punishment. (*Id*. at 18.) Defendants argue that Plaintiff has failed to produce evidence showing that a serious medical injury resulted from the alleged delays. (ECF No. 10.) The Court notes that Plaintiff identifies only Defendant Entler and Defendant McNally as personally responsible for the alleged failure to timely procure his medical records.

In determining whether a prison's failure to timely treat a condition adequately, "medical proof is necessary to assess whether the delay caused a serious medical injury." *Blackmore*, 390 F.3d at 898. In the instant case, even after receiving Plaintiff's prior medical records, Defendants did not adopt Plaintiff's prior treatment regime. As discussed above, Defendant Dr.

14

Weidman's testimony indicates that Defendants chose not to treat Plaintiff with Entocort due to their concerns about potential side effects.

Defendant Dr. Weidman testified that, although Plaintiff requested prescriptions of Entocort, he treated with Mesalamine.  (ECF No. 52-1 at 2.)  According to Defendant Dr. Weidman, Entocort "is more effective than prednisone but cortico-steroids are not appropriate for long-term maintenance of Crohn's disease except in very cases."  (*Id*.)  Defendant Dr. Weidman indicated that Entocort's side effects include "early cataract formation, hyperglycemia, adrenal failure, and avascular necrosis."  (*Id*.)  In Defendant Dr. Weidman's medical opinion, "Mr. Cohen's disease does not indicate a need for Entocort."  (*Id*.)  Defendant Dr. Weidman further testified that when his Crohn's disease patients have "severe" episodes, he then treats them with steroids and pain management drugs, rather than his usual course of treatment.  (*Id*. at 3.)

Furthermore, Plaintiff's primary allegation with respect to his prior medical records is that Defendants would have treated him differently, and more efficaciously, *but for* their ignorance of his treatment history.  Plaintiff's own Complaint, as well as Defendant Dr. Weidman's testimony, however, makes it clear that Defendants already considered Plaintiff's repeated demands for Entocort and chose an alternative method of treatment.  (ECF No. 8 at 6, 10.)  Plaintiff has provided no evidence that would tend to suggest Defendants did not consider treating him with Entocort.

Moreover, after Defendants received Plaintiff's prior records in May 2014, they continued to treat him with medications other than Entocort.  Plaintiff has not adduced any evidence that would tend to show that Defendants would have treated him differently had they

15

received his medical records earlier. The uncontroverted evidence shows that Defendants' treatment plan would not have changed had they received Plaintiff's medical records at some unspecified, earlier time. The Undersigned finds, therefore, that Plaintiff has failed to present the required "medical proof . . . to assess whether the delay caused a serious medical injury." *Blackmore*, 390 F.3d at 898. Rather, Plaintiff's allegations respecting his medical records represent, in another form, "a difference of opinion between [a prisoner] and the prison health care providers and a dispute over the adequacy of [a prisoner's] treatment . . . [which] does not amount to an Eighth Amendment claim." *Apanovitch*, 32 F. App'x at 707.

Accordingly, the Undersigned concludes that Plaintiff has not adduced sufficient evidence to create a genuine issue of material fact as to whether Defendants violated his Eighth Amendment rights against cruel and unusual punishment in procuring his prior medical records.

### IV. CONCLUSION

For the reasons set forth above, the Undersigned finds that summary judgment is appropriate on Plaintiff's deliberate indifference claim arising from Defendants treatment of Plaintiff's Crohn's Disease and kidney stones. The Undersigned further finds that Defendants are entitled to qualified immunity.

Accordingly, the Undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment be **GRANTED** and that judgment be entered in favor of Defendants. (ECF Nos. 52 & 69.) The Undersigned further **RECOMMENDS** that Plaintiff's Motion for Default Judgment (ECF No. 100) and Supplemental Motion for Default Judgment (ECF No. 101) be **DENIED** as moot.

The Undersigned has reviewed the various discovery motions pending in this matter and finds that any eventual production of the information would not affect the findings in this Report and Recommendation. Accordingly, Defendants' Motion to Stay Discovery (ECF No. 107) and Plaintiff's Request to Instruct Defendants (ECF No. 82), Motions for Extension of Time (ECF Nos. 85, 90, & 99), and Motion to Compel (ECF No. 86) are **DENIED** without prejudice and are subject to renewal pending the District Judge's disposition of this Report and Recommendation.

## **PROCEDURE ON OBJECTIONS**

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994

17

(6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

**IT IS SO ORDERED.**


Date: July 18, 2016                         /s/ *Elizabeth A. Preston Deavers*
                                            Elizabeth A. Preston Deavers
                                            United States Magistrate Judge